Filed 8/31/16  P. v. Guerrero CA4/1

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

|  |  |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>EDWIN GUERRERO et al.,<br><br>    Defendants and Appellants. | D069072<br><br><br><br>(Super. Ct. No. FBA1200622) |

APPEALS from judgments of the Superior Court of San Bernardino County, Alexander R. Martinez, Judge.  Affirmed in part; reversed in part; remanded with directions.

Stephen M. Lathrop, under appointment by the Court of Appeal, for Defendant and Appellant Reginaldo J. Acosta, Jr.

Gregory L. Cannon, under appointment by the Court of Appeal, for Defendant and Appellant Ana Dimas.

Kurt D. Hermansen, under appointment by the Court of Appeal, for Defendant and Appellant Edwin Guerrero.

Kamala D. Harris, Attorney General, Gerald A. Engler, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, Eric A. Swenson, Kristine A. Gutierrez and Lynne G. McGinnis, Deputy Attorneys General, for Plaintiff and Respondent.

A jury convicted Edwin Guerrero, Ana Dimas, and Reginaldo J. Acosta, Jr., (together defendants) of one count each of carjacking (Pen. Code, § 215, subd. (a)),[1] two counts each of kidnapping during carjacking (§ 209.5, subd. (a)), and one count each of active participation in a criminal street gang (§ 186.22, subd. (a)). The jury found true several gang and firearms-related sentencing enhancements as to the carjacking and kidnapping during carjacking counts. (§§ 186.22, subd. (b), 12022.53, subds. (b), (c), (d).) The jury also convicted Acosta of three counts of premeditated attempted murder (§§ 187, subd. (a), 664), with gang and firearms-related sentencing enhancements (§§ 186.22, subd. (b), 12022.53, subds. (b), (c), (d)).

The court sentenced Guerrero to an indeterminate term of 64 years to life in prison. Following Dimas's admission of a prior prison term under section 667.5, subdivision (b), the court sentenced her to an indeterminate term of 65 years to life in prison. The court found Acosta had suffered two prior serious or violent felony convictions under section 667, subdivision (d); two prior convictions under section 667, subdivision (a); and a prior prison term under section 667.5, subdivision (b). The court

---

[1]     Further statutory references are to the Penal Code unless otherwise stated.

sentenced Acosta to an indeterminate term of 325 years to life in prison and a determinate term of 106 years.

Guerrero, Dimas, and Acosta appeal. They raise a number of challenges to the judgments. Guerrero, Dimas, and Acosta each contend (1) the evidence does not support the jury's true findings on their gang enhancements; (2) the court erred in admitting certain gang-related expert testimony; and (3) carjacking is a lesser included offense of kidnapping during carjacking, so they could not properly be convicted of both. Guerrero additionally contends his counsel was ineffective because he did not object to Guerrero's sentence on the grounds it violated the federal Constitution's prohibition on cruel and unusual punishment. Dimas additionally contends (1) the evidence does not support her conviction for active participation in a criminal street gang and (2) the court erred by not instructing the jury on the defense of duress. Acosta additionally contends (1) the evidence does not support his convictions for premeditated attempted murder; (2) the court erred by not instructing the jury on attempted voluntary manslaughter as a lesser included offense of attempted murder; (3) his constitutional rights to due process and a jury trial were violated when the court used a prior juvenile adjudication as a prior strike under the "Three Strikes" law; (4) the court erred by using a prior juvenile adjudication to impose a five-year enhancement under section 667, subdivision (a); (5) the evidence does not support the court's true finding on a prior strike allegation; (6) the court erred in imposing an additional one-year enhancement for a prior prison term under section 667.5, subdivision (b); and (7) the court erred in calculating his presentence custody credits.

3

The Attorney General concedes (1) the convictions for carjacking should be reversed, (2) Acosta's additional one-year prior prison term enhancement should be stricken, and (3) the court erred in calculating Acosta's presentence custody credits. We conclude these contentions have merit as well. We further conclude the court erred by imposing a five-year sentencing enhancement under section 667, subdivision (a) based on Acosta's prior juvenile adjudication. Defendants' remaining contentions are unpersuasive. We therefore reverse defendants' convictions for carjacking with directions to dismiss those charges. We will vacate Acosta's sentence and remand for resentencing consistent with this opinion. In all other respects, the judgments are affirmed.

FACTS

For purposes of this section, we state the evidence in the light most favorable to the judgments. (See *People v. Osband* (1996) 13 Cal.4th 622, 690; *People v. Dawkins* (2014) 230 Cal.App.4th 991, 994.) Additional facts will be discussed where relevant in the following section.

On October 30, 2012, Carlos Albino, his brother, and a friend stopped at a gas station along Interstate 15 in Baker, California. A short time later, a Honda Civic pulled into the station. Albino noticed the Honda's muffler was dragging on the ground, and he walked over to the Honda to tell the occupants. Albino's friend saw Albino engage in a physical struggle with one of the occupants, later identified as Acosta. Acosta grabbed Albino's jacket as Albino tried to walk away, pulled out a gun, and shot Albino three times. Another occupant of the Honda, later identified as Guerrero, stood by with a

4

windshield cleaner in his hand.  After the shots, Acosta and Guerrero got into the Honda and drove away.  A gas station attendant called emergency personnel, who transported Albino to a hospital.  He was treated for gunshot wounds to his neck and shoulder.

Meanwhile, Donald Smith and his adult grandson, James DePersis, had stopped in Smith's Toyota Highlander sport utility vehicle in a vacant lot just off Interstate 15, also near Baker.  They were on their way from Orange County, California, to Utah for an elk hunting trip.  Smith and DePersis got out of the Toyota, stretched their legs, and began to eat a snack.  After about 10 minutes, a Honda Civic passed them, turned around, and stopped approximately 30 to 50 feet away.  Acosta, Guerrero, and another passenger (later identified as Dimas) got out of the Honda and approached Smith and DePersis.  Acosta told Smith and DePersis his grandmother was dying and they needed a ride to Las Vegas.  Smith refused, telling Acosta they had a destination to get to and did not have time.

After asking again, and receiving another negative response, Acosta reached into his waistband and pulled out a gun.  Acosta told Smith and DePersis they were going to give his group a ride.  Smith initially got into the driver's seat, but Acosta told Smith to give the car keys to Dimas.  Dimas got into the driver's seat, and Smith took the front passenger seat.  Acosta pointed his gun at DePersis's face and told him to get into the Toyota.  DePersis, Guerrero, and Acosta sat in the rear bench seat, with DePersis behind Smith, Guerrero in the middle, and Acosta behind Dimas.

Dimas drove the Toyota onto northbound Interstate 15 towards Las Vegas.  Acosta continued to point his gun at Smith.  Acosta said, "I'll do you a favor.  I'll let you live, but

5

you have to do me a favor" and give them $500. Smith had a large amount of money in his pockets for the trip. He gave Acosta a few bills, but Acosta demanded more. Smith gave Acosta a few bills several additional times.

Smith asked Acosta why he had to take money from hardworking people. Acosta became angry. He said Smith and DePersis would be in trouble if his grandmother died in Las Vegas. Acosta said to Smith, "You've already lived a long life," and DePersis had not "do you really want to take that away from [him]?" Dimas told DePersis to "act cool."

At some point, the glove compartment in front of Smith opened suddenly. A number of items fell out. One of the items was Smith's unloaded Smith & Wesson Airweight revolver, which was in a small case. Smith kicked the revolver under his seat. Later Smith surreptitiously picked up the revolver and put it in his pocket.

Acosta continued to demand money, and he eventually put down his gun to grab all of the bills Smith gave him. Seeing his chance, Smith grabbed his revolver and pointed it at Acosta. Acosta and Guerrero tried to grab the revolver, but then Acosta picked up his own gun. Smith dropped his unloaded revolver and reached for Acosta's gun. DePersis also grabbed Acosta's gun, and he attempted to pull the gun so it was not pointing at Smith. Acosta fired, hitting DePersis in the hand. As the struggle continued, Acosta fired a few more times, once hitting Smith's finger and other times hitting the window and ceiling behind Smith. Dimas continued to drive along the freeway at high speed.

Guerrero picked up Smith's revolver and tried to shoot. After he realized it was unloaded, he began to beat Smith and DePersis with the butt of the revolver. At some point, Smith and DePersis managed to turn Acosta's gun around and it went off, hitting Guerrero in the finger. Guerrero exclaimed, "I've been hit" or "I've been shot." Dimas lost control or drove the Toyota off the freeway and into a gravel truck runoff area. The Toyota hit a gravel berm and stopped. Approximately 30 to 45 minutes had passed since they began driving.

Acosta, Guerrero, and Dimas quickly got out of the Toyota and ran away. DePersis called 911. Smith flagged down a passing truck driver, who stopped and rendered assistance. Emergency personnel arrived and transported Smith and DePersis to a medical center in Las Vegas. Smith and DePersis were treated for the gunshot wounds to their hands, as well as serious lacerations and bruising to their heads. The wound on DePersis's hand required surgery to repair damaged bones, tendons, and ligaments.

California Highway Patrol officers located Guerrero approximately a half-mile away from the Toyota. Later that day, officers found Acosta and Dimas walking along Interstate 15 near the Nevada border. They were taken into custody.

Further investigation revealed Acosta, Guerrero, and Dimas were from the Los Angeles area. Acosta had borrowed the Honda Civic from Miguel Duran in Compton, California. Law enforcement had contacted Acosta and Guerrero in the past, and they said they were from Barrios Los Padrinos (BLP), a Los Angeles area gang. Acosta and Guerrero had numerous BLP-related tattoos. In a recorded phone call while he was

7

awaiting trial, Acosta told Duran he "did everything for the hood." Duran was an associate of BLP.

At trial, a Los Angeles County Sheriff's deputy, Fernando Sarti, provided his opinion that BLP was a criminal street gang and Guerrero and Acosta were members of the gang. Although Dimas was a member of a gang called Hickory Street Watts, Sarti believed she was an associate of BLP as well. Sarti had contacted Dimas several times with Acosta's younger brother, who was a member of BLP. Dimas had a tattoo on her finger that said "Lil Tricks" (or "Lil Trix"), Acosta's gang moniker.

Sarti testified that Acosta, Guerrero, and Dimas were active participants in BLP and the charged offenses were committed at the direction of, in association with, or for the benefit of BLP. Sarti said his opinion was based on his knowledge and experience with gang culture, as well as evidence the defendants were all gang members or gang associates. Sarti also believed that the offenses would benefit BLP because individuals in BLP's territory would hear about the offenses, which would enhance BLP's reputation for violence and increase its power.

## DISCUSSION

### I

### *Premeditated Attempted Murder*

Acosta contends the evidence does not support his convictions for premeditated attempted murder of Albino, Smith, and DePersis. Specifically, Acosta argues the evidence does not show that Acosta intended to kill DePersis or that he attempted to kill any of the victims with premeditation and deliberation.

8

A

"In reviewing a sufficiency of evidence claim, the reviewing court's role is a limited one. ' "The proper test for determining a claim of insufficiency of evidence in a criminal case is whether, on the entire record, a rational trier of fact could find the defendant guilty beyond a reasonable doubt. [Citations.] On appeal, we must view the evidence in the light most favorable to the People and must presume in support of the judgment the existence of every fact the trier could reasonably deduce from the evidence." ' " (*People v. Smith* (2005) 37 Cal.4th 733, 738-739 (*Smith*).)

" ' "Although we must ensure the evidence is reasonable, credible, and of solid value, nonetheless it is the exclusive province of the trial judge or jury to determine the credibility of a witness and the truth or falsity of the facts on which that determination depends. [Citation.] Thus, if the verdict is supported by substantial evidence, we must accord due deference to the trier of fact and not substitute our evaluation of a witness's credibility for that of the fact finder." ' " (*Smith, supra*, 37 Cal.4th at p. 739.)

"In cases in which the People rely primarily on circumstantial evidence, the standard of review is the same. [Citations.] 'Although it is the duty of the jury to acquit a defendant if it finds that circumstantial evidence is susceptible of two interpretations, one of which suggests guilt and the other innocence [citations], it is the jury, not the appellate court which must be convinced of the defendant's guilt beyond a reasonable doubt. If the circumstances reasonably justify the trier of fact's findings, the opinion of the reviewing court that the circumstances might also reasonably be reconciled with a contrary finding does not warrant a reversal of the judgment. [Citations.]' [Citation.] 'Circumstantial

9

evidence may be sufficient to connect a defendant with the crime and to prove his guilt beyond a reasonable doubt.' " (*People v. Thomas* (1992) 2 Cal.4th 489, 514 (*Thomas*).)

B

" 'Attempted murder requires the specific intent to kill and the commission of a direct but ineffectual act towards accomplishing the intended killing.' " (*People v. Stone* (2009) 46 Cal.4th 131, 136.)  "There is rarely direct evidence of a defendant's intent. Such intent must usually be derived from all the circumstances of the attempt, including the defendant's actions.  [Citation.]  The act of firing toward a victim at a close, but not point blank, range 'in a manner that could have inflicted a mortal wound had the bullet been on target is sufficient to support an inference of intent to kill . . . .'  [Citation.]  'The fact that the shooter may have fired only once and then abandoned his efforts out of necessity or fear does not compel the conclusion that he lacked the animus to kill in the first instance.  Nor does the fact that the victim may have escaped death because of the shooter's poor marksmanship necessarily establish a less culpable state of mind.' " (*People v. Chinchilla* (1997) 52 Cal.App.4th 683, 690 (*Chinchilla*); see *People v. Perez* (2010) 50 Cal.4th 222, 230 (*Perez*).)  "These principles, taken together, reflect that the act of purposefully firing a lethal weapon at another human being, at close range, without legal excuse, generally gives rise to an inference that the shooter acted with express malice [i.e., intent to kill]." (*Smith, supra*, 37 Cal.4th at p. 742.)

Here, the evidence showed Acosta shot DePersis in the hand as they struggled for control of Acosta's gun.  The jury could reasonably infer that Acosta was aiming at DePersis from the facts that Acosta was fighting with DePersis at that moment and

10

DePersis was actually shot. Because the shot occurred at close range, and under circumstances that could have inflicted a mortal wound had Acosta aimed more effectively, the jury could reasonably infer Acosta intended to kill DePersis as well. (See *Perez, supra*, 50 Cal.4th at p. 230; *Smith, supra*, 37 Cal.4th at p. 742; *Chinchilla, supra*, 52 Cal.App.4th at p. 690.) This inference is further supported by Acosta's implied threat against DePersis's life when Acosta demanded money from Smith: "You've already lived a long life," and DePersis had not, "do you really want to take that away from him?"

Acosta claims he never aimed the gun at DePersis and thus could not have intended to kill him. Acosta points to DePersis's testimony that Acosta was trying to aim the gun at Smith. But Acosta downplays DePersis's testimony that, at the time he was shot, DePersis had pulled the gun away from Smith. The jury could therefore reasonably infer Acosta was trying to shoot DePersis—and kill him—when Acosta pulled the trigger and DePersis's hand was hit. Similarly, DePersis's testimony that the front passenger window broke following the shot does not make this inference unreasonable. Although that window was directly behind Smith, it was not far from where DePersis was sitting in the close confines of the Toyota. The jury could infer that Acosta was attempting to inflict a fatal shot on DePersis, but only missed (hitting DePersis's hand and the front window) because he did not aim effectively. Substantial evidence supports the jury's implied finding that Acosta intended to kill DePersis.

C

Section 664, subdivision (a), provides for enhanced punishment for an attempted murder that is "willful, deliberate, and premeditated." (§ 664, subd. (a).) "A crime is

11

premeditated when it is considered beforehand and deliberate when the decision to commit the crime is formed or arrived at or determined upon as a result of careful thought and weighing of considerations for and against the proposed course of action."  (*People v. Gonzalez* (2012) 210 Cal.App.4th 875, 886.)

" ' "In *People v. Anderson* [(1968)] 70 Cal.2d [15,] 26-27, [the Supreme Court] identified three categories of evidence relevant to resolving the issue of premeditation and deliberation:  planning activity, motive, and manner of killing.  However, as later explained in *People v. Pride* (1992) 3 Cal.4th 195, 247:  '*Anderson* does not require that these factors be present in some special combination or that they be accorded a particular weight, nor is the list exhaustive.  *Anderson* was simply intended to guide an appellate court's assessment whether the evidence supports an inference that the killing occurred as the result of preexisting reflection rather than unconsidered or rash impulse.  [Citation.]' Thus, while premeditation and deliberation must result from ' "careful thought and weighing of considerations" ' (70 Cal.2d at p. 27), we continue to apply the principle that '[t]he process of premeditation and deliberation does not require any extended period of time.  "The true test is not the duration of time as much as it is the extent of the reflection. Thoughts may follow each other with great rapidity and cold, calculated judgment may be arrived at quickly . . . ." ' " ' "  (*People v. Manriquez* (2005) 37 Cal.4th 547, 577.) "The *Anderson* guidelines were formulated as a synthesis of prior case law, and are not a definitive statement of the prerequisites for proving premeditation and deliberation in every case."  (*People v. Hawkins* (1995) 10 Cal.4th 920, 957.)

12

As to Albino, the jury's finding of premeditation and deliberation is supported by the evidence. Viewing the evidence as a whole, and in the light most favorable to the judgment, the jury could reasonably infer the following sequence of events that resulted in Albino's attempted murder: Acosta armed himself with his gun, concealed it on his person, and began talking with Albino. A scuffle ensured, and Albino attempted to flee. Acosta grabbed Albino's jacket and stopped him. Acosta pulled Albino close, drew his gun, and fired three shots, hitting Albino in the upper body.

This sequence shows evidence of planning activity (Acosta's decision to arm himself and conceal his weapon) and a manner of killing (Acosta's decision to restrain Albino, draw his gun, and fire multiple shots) that supports the jury's finding of premeditation and deliberation. Although Acosta's precise motive is somewhat unclear, the jury could reasonably infer that Acosta demanded something of Albino (perhaps money or a ride to Las Vegas, as he later demanded of Smith and DePersis) and Albino refused, which led Acosta to shoot Albino. "In any event, '[the Supreme Court has] never required the prosecution to prove a specific motive before affirming a judgment, even one of first degree murder. A senseless, random, but premeditated, killing supports a verdict of first degree murder.' " (*Thomas, supra*, 2 Cal.4th at p. 519.)

Acosta contends, "[t]he logical inference is that when [Acosta] displayed the handgun, Albino suddenly grabbed [Acosta], and then [Acosta] fired the handgun." But, as we have explained, this is not the only logical inference to be drawn from the evidence. The jury could have reasonably found that Albino tried to flee and Acosta (by grabbing Albino's jacket) restrained him in order to kill him. "Even if we might have

13

made contrary factual findings or drawn different inferences, we are not permitted to reverse the judgment if the circumstances reasonably justify those found by the jury. It is the jury, not the appellate court, that must be convinced beyond a reasonable doubt. Our task and responsibility is to determine whether that finding is supported by substantial evidence." (*People v. Perez* (1992) 2 Cal.4th 1117, 1126.) Substantial evidence supports the jury's finding of premeditation and deliberation here.

As to Smith and DePersis, the jury's findings of premeditation and deliberation are also supported by the evidence. The jury could reasonably infer the following: Acosta consciously armed himself with his gun. When he approached Smith and DePersis, and demanded a ride to Las Vegas, he impliedly threatened their lives if they refused. Similarly, while in Smith's Toyota, Acosta demanded money and threatened Smith and DePersis's lives. Acosta said to Smith, "You've already lived a long life," and DePersis had not, "do you really want to take that away from [him]?" When Smith resisted by drawing his own revolver, Acosta made good on his threats, firing at Smith and DePersis multiple times as they struggled over Acosta's gun.

As with Albino's attempted murder, this evidence falls into the categories of planning activity (Acosta's decision to arm himself and his threats against Smith and DePersis) and a manner of killing (Acosta's decision to fire multiple shots, including after DePersis and Smith were hit) that support the jury's finding of premeditation and deliberation. The motive for these crimes is also readily apparent: Smith and DePersis resisted Acosta's demands and, as he had threatened, Acosta tried to kill them. Moreover, the delay between the beginning of the struggle and the shots, and between the multiple

14

shots, supports the inference that Acosta deliberated over whether to shoot Smith and DePersis before he made the decision to do so.

Acosta claims the manner of the shootings shows they were hasty, unplanned, and haphazard. Again, however, we cannot credit such an inference given our standard of review. The issue is not whether a reasonable jury could have found the shootings hasty or unplanned, or whether we believe them to be so, but whether a reasonable jury could find the opposite (as the jury did here). (See *People v. Pride, supra*, 3 Cal.4th at p. 247 ["Of course, the appellate court does not substitute its judgment for that of the jury but affirms the verdict if a rational trier of fact could find premeditation and deliberation beyond a reasonable doubt."]; see also *People v. Wharton* (1991) 53 Cal.3d 522, 548.) As we have explained, a reasonable jury could have found the shootings deliberate and premeditated. Moreover, Acosta's characterization ignores the threats he made against Smith and DePersis's lives, the multiple shots he fired while in the Toyota, and his motivation for killing Smith and DePersis. Substantial evidence supports the jury's finding of premeditation and deliberation as to Smith and DePersis.

II

*Instruction on Attempted Voluntary Manslaughter*

Acosta also contends the court erred by not instructing the jury on attempted voluntary manslaughter, as a lesser included offense of attempted murder, on the theory of sudden quarrel or heat of passion. Under this theory, attempted voluntary manslaughter is a lesser included offense of attempted murder because the heat of passion negates the element of malice required to prove attempted murder. (See *People v.*

15

*Breverman* (1998) 19 Cal.4th 142, 154 (*Breverman*); *People v. Gutierrez* (2003) 112 Cal.App.4th 704, 708.) A trial court generally has a sua sponte duty to instruct on lesser included offenses "when the evidence raises a question as to whether all of the elements of the charged offense were present [citation], but not when there is no evidence that the offense was less than that charged." (*Breverman,* at p. 154.) We review de novo whether the trial court erred by not providing such an instruction. (*People v. Oropeza* (2007) 151 Cal.App.4th 73, 78 (*Oropeza*).)

Acosta was the aggressor and culpably responsible for the events leading to the three attempted murders here. It is well settled that a defendant who provokes a fight may not invoke the theory of sudden quarrel or heat of passion to negate malice: "A defendant may not provoke a fight, become the aggressor, and, without first seeking to withdraw from the conflict, kill an adversary and expect to reduce the crime to manslaughter by merely asserting that it was accomplished upon a sudden quarrel or in the heat of passion. The claim of provocation cannot be based on events for which the defendant is culpably responsible." (*Oropeza, supra*, 151 Cal.App.4th at p. 83 [finding no error where trial court did not instruct on voluntary manslaughter]; see *People v. Johnston* (2003) 113 Cal.App.4th 1299, 1312-1313 (*Johnston*); *People v. Hoover* (1930) 107 Cal.App. 635, 639.) As such, Acosta was not entitled to an instruction of attempted voluntary manslaughter on the theory of sudden quarrel or heat of passion.

Acosta urges us not to follow this line of authority. In support, he cites two United States Supreme Court cases involving the common law doctrine (now codified by statute in California) of "forfeiture by wrongdoing," which is an exception to the general

16

evidentiary rule prohibiting admission of a declarant's hearsay statements where a defendant has caused the declarant to be unavailable. (*Giles v. California* (2008) 554 U.S. 353, 359; *Davis v. Washington* (2006) 547 U.S. 813, 833; see Evid. Code, § 1390.) Acosta does not provide any authority, or any reasoned explanation, why this doctrine has any application to the substantive criminal law at issue here. We find nothing in these cases, or in the cited section of the Evidence Code, that would undermine the reasoning of *Oropeza* and *Johnston*.

Acosta also points out that the statute defining the crime of voluntary manslaughter contains no express exception for situations in which the defendant was the aggressor and was culpably responsible for the conflict. The statute defines manslaughter as "the unlawful killing of a human being without malice." (§ 192.) The statute further defines voluntary manslaughter as occurring "upon a sudden quarrel or heat of passion." (§ 192, subd. (a).) *Oropeza* and *Johnston* interpret these definitions, which is the proper role of the judiciary, and elaborate on the type of sudden quarrel or heat of passion contemplated by the statute. The same type of elaboration occurs when the judiciary establishes, for example, the test that must be met to show sudden quarrel or heat of passion. (See, e.g., *People v. Beltran* (2013) 56 Cal.4th 935, 946 [defining the "adequacy of provocation" for purposes of the sudden quarrel or heat of passion theory of voluntary manslaughter].) The fact that the statute does not expressly except situations where the defendant was the aggressor and was culpably responsible for the conflict does not mean the statute must encompass such situations. Acosta has provided no reason to disagree with *Oropeza* and *Johnston.*

17

Even if the court had erred by not providing the instruction, any error would be harmless beyond a reasonable doubt because the jury found that the attempted murders were willful, deliberate, and premeditated. (See *People v. Peau* (2015) 236 Cal.App.4th 823, 830, 832 [finding a similar error harmless beyond a reasonable doubt].) Acosta contends the jury was presented with an "unwarranted all-or-nothing situation of either convicting [Acosta] of attempted murder or acquitting him of the charges." But Acosta ignores the jury's finding of premeditation and deliberation, which went beyond the findings necessary for attempted murder. That finding precluded the determination that Acosta acted upon a sudden quarrel or heat of passion. (See *ibid.*) Even if the court committed error, it was harmless beyond a reasonable doubt in light of the jury's verdict.

III

*Duress*

Dimas contends the court erred by not instructing the jury on the defense of duress. "It is well settled that a defendant has a right to have the trial court, on its own initiative, give a jury instruction on any affirmative defense for which the record contains substantial evidence [citation]—evidence sufficient for a reasonable jury to find in favor of the defendant [citation]—unless the defense is inconsistent with the defendant's theory of the case [citation]. In determining whether the evidence is sufficient to warrant a jury instruction, the trial court does not determine the credibility of the defense evidence, but only whether 'there was evidence which, if believed by the jury, was sufficient to raise a reasonable doubt.' " (*People v. Salas* (2006) 37 Cal.4th 967, 982.) "The testimony of one witness . . . may constitute substantial evidence [citation], and doubts as to the sufficiency

18

of the evidence must be resolved in favor of the accused [citation]." (*People v. Speaks* (1981) 120 Cal.App.3d 36, 40.) "On review, we determine independently whether substantial evidence to support a defense existed." (*People v. Shelmire* (2005) 130 Cal.App.4th 1044, 1055.)

The defense of duress is defined by statute. The defense covers crimes (except those punishable by death) by defendants "who committed the act or made the omission charged under threats or menaces sufficient to show that they had reasonable cause to and did believe their lives would be endangered if they refused." (§ 26.) The threats or menaces must be immediate—"the situation of a present and active aggressor threatening immediate danger"—and life-threatening. (*People v. Condley* (1977) 69 Cal.App.3d 999, 1011.) "To establish duress a defendant would have to show that he had (1) an actual belief his life was threatened and (2) a reasonable cause of such belief. Because of the immediacy requirement, a person committing a crime under duress has only the choice of imminent death or executing the requested crime. The person being threatened has no time to formulate what is a reasonable and viable course of conduct nor to formulate criminal intent." (*Id.* at p. 1012.) " 'Duress is an effective defense only when the actor responds to an immediate and imminent danger.' " (*People v. Hamlin* (2009) 170 Cal.App.4th 1412, 1460.)

The record here provides no basis for the defense of duress. There is no evidence Acosta or Guerrero threatened Dimas with harm, let alone threatened her life. Dimas points to Acosta's acts of violence directed towards Albino, Smith, and DePersis. But those acts do not give rise to a reasonable inference that *Dimas's* life was threatened.

19

Dimas also points to evidence that Acosta told Dimas to drive Smith's Toyota and to slow down while she was driving. Acosta's statements were not accompanied by any threat (immediate or otherwise), and no such threat can be reasonably inferred from the evidence. As such, they provide no basis for the defense of duress. (See *People v. Manson* (1976) 61 Cal.App.3d 102, 206 ["Simply following orders is not a defense under the facts of this case."].) In closing argument, Dimas's counsel appeared to argue a theory somewhat related to duress. However, absent evidence to support a defense, the trial court was not required to instruct on it. " 'A party is not entitled to an instruction on a theory for which there is no supporting evidence.' " (*People v. Roldan* (2005) 35 Cal.4th 646, 715.)

IV

*Carjacking*

Guerrero, Dimas, and Acosta contend their convictions for carjacking (§ 215) should be reversed because carjacking is a lesser included offense of kidnapping during carjacking (§ 209.5), of which they were also convicted. (*People v. Ortiz* (2002) 101 Cal.App.4th 410, 415; *People v. Contreras* (1997) 55 Cal.App.4th 760, 765.) The Attorney General concedes the issue, and we agree. We will therefore reverse defendants' convictions for carjacking.

V

*Gang Enhancements*

Guerrero, Dimas, and Acosta contend the evidence does not support the gang enhancements found by the jury. The statute prescribes the enhancement for "any person

20

who is convicted of a felony committed for the benefit of, at the direction of, or in association with any criminal street gang, with the specific intent to promote, further, or assist in any criminal conduct by gang members . . . ."  (§ 186.22, subd. (b)(1).)

The statute establishes two prongs that must be met in order to find the enhancement.  The first prong requires the underlying crime to be committed for the benefit of, at the direction of, or in association with any criminal street gang.  (§ 186.22, subd. (b)(1).)  The Legislature included this prong "to make it 'clear that a criminal offense is subject to increased punishment under the [Street Terrorism Enforcement and Prevention] Act only if the crime is "gang related." ' [Citation.]  Not every crime committed by gang members is related to a gang."  (*People v. Albillar* (2010) 51 Cal.4th 47, 60 (*Albillar*).)  However, as a general matter, a jury may "reasonably infer the requisite association from the very fact that [a] defendant committed the charged crimes in association with fellow gang members."  (*People v. Morales* (2003) 112 Cal.App.4th 1176, 1198 (*Morales*); see *Albillar,* at p. 62.)  The second prong requires a defendant to specifically intend to promote, further, or assist in criminal conduct by gang members.  (§ 186.22, subd. (b)(1).)  This criminal conduct may include the offense or offenses to which the enhancement applies and is not limited to other criminal conduct by gang members.  (*Albillar,* at p. 65.)  Therefore, "if substantial evidence establishes that the defendant intended to and did commit the charged felony with known members of a gang, the jury may fairly infer that the defendant had the specific intent to promote, further, or assist criminal conduct by those gang members."  (*Id.* at p. 68.)

21

"In considering a challenge to the sufficiency of the evidence to support an enhancement, we review the entire record in the light most favorable to the judgment to determine whether it contains substantial evidence—that is, evidence that is reasonable, credible, and of solid value—from which a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt." (*Albillar, supra*, 51 Cal.4th at pp. 59-60.)

As to the first prong, the evidence supports the reasonable inference that the offenses here were committed in association with the BLP criminal street gang. Acosta and Guerrero were members of BLP, and Dimas was an associate. The fact the offenses were committed with BLP gang members or associates shows the offenses were committed in association with BLP. (See *Morales, supra*, 112 Cal.App.4th at p. 1198; see also *Albillar, supra*, 51 Cal.4th at p. 62.) Acosta and Guerrero were committed BLP gang members, as shown by their numerous contacts with law enforcement and their gang tattoos; Dimas likewise was substantially connected to BLP, and she had Acosta's gang moniker tattooed on her finger. The defendants' commitment to BLP supports the inference that the offenses were committed in association with BLP. (See *People v. Livingston* (2012) 53 Cal.4th 1145, 1171; see also *Albillar,* at p. 62.) The evidence also showed that Acosta obtained the Honda Civic—a crucial part of the events surrounding the charged offenses—from a BLP gang associate. (See *Albillar,* at p. 60 ["defendants relied on . . . the apparatus of the gang in committing" the offenses].) Thus, not only were the defendants members of or associated with BLP, but their car was associated with a BLP associate as well. Finally, Sarti, the prosecution's gang expert, testified that the crimes were committed for the benefit of, at the direction of, and in association with

22

BLP. Given this record, the jury was entitled to find the offenses were committed in association with BLP under section 186.22, subdivision (b)(1).[2]

Defendants point out that they did not display any gang signs, mention their gang affiliation, or otherwise communicate anything related to BLP during the charged offenses. (See *People v. Ochoa* (2009) 179 Cal.App.4th 650, 662 [reversing gang enhancement where defendant, acting alone, did not show any gang affiliation during the offense].) The absence of such evidence, however, does not make the jury's inference unreasonable based on the evidence we have already discussed. Defendants also claim the considerable geographic distance between the locations of the offenses and BLP's gang territory makes any inference of association unreasonable. Courts have recognized that offenses, even those committed by gang members, may not be associated with a gang where the gang members were on a "frolic and detour" unrelated to the gang. (See *Albillar, supra*, 51 Cal.4th at p. 62; *Morales, supra*, 112 Cal.App.4th at p. 1198.) A reasonable jury might well have found that the circumstances of the offenses here were such a situation. But the jury here found the opposite. As we have noted, the question is not whether the jury could have found the crimes were not gang related, but whether the evidence was sufficient to support the reasonable inference they were. We conclude the

---

2      Additional evidence supporting this prong of the gang enhancement was admitted against Acosta only. Investigators recorded a jailhouse phone call between Acosta and Duran, the BLP gang associate who had provided the Honda to Acosta. During the call, Acosta told Duran that, on the day of the charged offenses, "he had did [*sic*] everything for the hood . . . ." The jury could reasonably infer from this statement that Acosta's reference to "the hood" was synonymous with the BLP criminal street gang and that he had committed the charged offenses in association with and for the benefit of BLP.

great geographic distance here did not preclude the jury from making the reasonable inference that the offenses here were committed in association with the gang, given the significant gang commitments of each of the defendants, the fact the defendants acted together, and the fact the vehicle in which they traveled the distance was itself obtained from a BLP gang associate.

Guerrero claims the fact that a defendant commits an offense with other gang members is insufficient as a matter of law to support the reasonable inference that the defendant committed the offense in association with a gang. As an initial matter, we note that the evidence here was not so limited, as we have discussed. Moreover, Guerrero's argument runs counter to the holding in *Morales, supra*, 112 Cal.App.4th at page 1198, that "the jury could reasonably infer the requisite association from the very fact that defendant committed the charged crimes in association with fellow gang members." In support, Guerrero points to authority from our Supreme Court that the *second* prong of the gang enhancement is met where a defendant commits an offense with other gang members. (See *Albillar, supra*, 51 Cal.4th at p. 68.) If the same evidence could support the *first* prong as well, Guerrero argues, the two prongs would be impermissibly redundant. Guerrero is incorrect. The rule against redundancy (or surplusage) is a maxim of interpretation used when construing statutory language. (See, e.g., *Dyna-Med, Inc. v. Fair Employment & Housing Commission* (1987) 43 Cal.3d 1379, 1387 ["A

construction making some words surplusage is to be avoided."].)[3]  The rule is not implicated where two statutory provisions, with different substantive meanings, are satisfied by the reasonable inferences flowing from the same evidence.

As to the second prong, the record supports the conclusion that the defendants intended to and did commit the charged offenses with known members of BLP (Acosta and Guerrero).  As we have discussed, our Supreme Court has held a jury may reasonably infer on that basis that each defendant had the specific intent to promote, further, or assist criminal conduct by gang members.  (See *Albillar, supra*, 51 Cal.4th at p. 68.)  The evidence therefore supports both prongs of the gang enhancements found by the jury.

VI

*Active Participation in a Criminal Street Gang*

Dimas contends the evidence does not support her conviction for active participation in a criminal street gang under section 186.22.  The statute provides as follows:  "Any person who actively participates in any criminal street gang with knowledge that its members engage in or have engaged in a pattern of criminal gang activity, and who willfully promotes, furthers, or assists in any felonious criminal conduct by members of that gang, shall be punished . . . ."  (§ 186.22, subd. (a).)  "The elements of the gang participation offense in section 186.22[, subdivision] (a) are:  First, active participation in a criminal street gang, in the sense of participation that is more

---

[3]     Guerrero cites a concurring and dissenting opinion from our Supreme Court as authority for the same rule.  (See *People v. Fierro* (1991) 1 Cal.4th 173, 262 (conc. & dis. opn. of Kennard, J.).)

than nominal or passive; second, knowledge that the gang's members engage in or have engaged in a pattern of criminal gang activity; and third, the willful promotion, furtherance, or assistance in any felonious criminal conduct by members of that gang. [Citation.]  A person who is not a member of a gang, but who actively participates in the gang, can be guilty of violating section 186.22[, subdivision] (a)." (*People v. Rodriguez* (2012) 55 Cal.4th 1125, 1130.)  We review Dimas's conviction for substantial evidence. (*People v. Rios* (2013) 222 Cal.App.4th 542, 559.)

Dimas appears to challenge the sufficiency of the evidence only as to the first element of the offense.  She claims the evidence of her involvement with BLP was limited to a handful of occasions when law enforcement contacted her in the company of at least one BLP member.  Dimas ignores the evidence of her tattoo with Acosta's gang moniker, which the jury could reasonably have interpreted as a sign of involvement with BLP.  Dimas also ignores the facts of the charged offenses, which show she was a willing participant in a series of violent acts with two BLP gang members.  Given this evidence, and the supporting opinions of gang expert Sarti, the jury could reasonably find that Dimas's involvement with BLP was more than nominal or passive.  (See *People v. Rodriguez, supra*, 55 Cal.4th at p. 1130.)  The evidence supports Dimas's conviction.

VII

*Gang Expert Testimony*

A

Defendants contend the court erred in admitting Sarti's expert testimony that the charged offenses were committed for the benefit of, at the direction of, and in association

26

with BLP.  At trial, Sarti testified on behalf of the prosecution.  During his testimony, Sarti stated he was familiar with the facts of the case based on reports he had obtained from the district attorney's office, conversations with a detective from the San Bernardino County Sheriff's Department, and Sarti's own knowledge of the defendants themselves. The prosecutor then summarized the facts of the case in a lengthy narrative, interrupting the narrative several times to ask Sarti whether the narrative was consistent with the information Sarti reviewed.  Sarti responded affirmatively each time.  After the narrative was complete, the prosecutor asked Sarti the following question:  "Based on your knowledge of these individuals, based on your training and experience, based on your knowledge of Barrio Los Padrinos, based on your knowledge of the facts in this case, the exhibits you've reviewed, the law enforcement officers that you have spoken with, do you have an opinion as to whether the crimes in this case were committed for the benefit of, at the direction of, or in association with a criminal street gang?"  Dimas's counsel objected on the grounds that the question called for a legal conclusion, invaded the province of the jury, and called for subjective intent testimony.  The court overruled the objection, and Sarti answered in the affirmative.

The prosecutor next asked Sarti to state his opinion.  Sarti responded, "It is my opinion that this crime was committed at the direction of, and in association of [*sic*] the criminal street gang of Barrio Los Padrinos.  It is my opinion that this gang is committing crime.  Even though they are committing this crime in San Bernardino County, it will make its way back to Los Angeles County.  Individuals [who] come to the court to support family members will talk about this, as well as the individuals themselves will

27

talk about this to other members [who] are incarcerated, which will eventually make its way back. These members worked together. Two individuals are from Barrio Los Padrinos and one individual is an associate. So that's what I base my opinion on." Dimas's counsel again objected, and the court overruled the objection. Sarti went on to explain in more detail the grounds for his opinion, including the benefit he believed would accrue to BLP based on the crimes.

The admissibility of expert testimony is governed by statute: "If a witness is testifying as an expert, his testimony in the form of an opinion is limited to such an opinion as is: [¶] (a) Related to a subject that is sufficiently beyond common experience that the opinion of an expert would assist the trier of fact; and [¶] (b) Based on matter (including his special knowledge, skill, experience, training, and education) perceived by or personally known to the witness or made known to him at or before the hearing, whether or not admissible, that is of a type that reasonably may be relied upon by an expert in forming an opinion upon the subject to which his testimony relates, unless an expert is precluded by law from using such matter as a basis for opinion." (Evid. Code, § 801.) The statute establishes two requirements for the admissibility of expert testimony: (1) the subject matter of the testimony must be sufficiently beyond common experience to assist the trier of fact and (2) the testimony must be based on a proper matter, either personal knowledge or any other matter upon which experts in the field may reasonably rely. (See *People v. Olguin* (1994) 31 Cal.App.4th 1355, 1371.) "A trial court's decision to admit expert testimony is reviewed for abuse of discretion." (*People v. Lindberg* (2008) 45 Cal.4th 1, 45 (*Lindberg*).)

28

Relying on the Supreme Court's opinion in *People v. Vang* (2011) 52 Cal.4th 1038 (*Vang*), defendants argue that Sarti's opinion testimony was improper because it was based on the facts of the case, rather than a hypothetical question grounded in those facts. In *Vang*, the prosecutor posed hypothetical questions to a gang expert, which the trial court allowed. (*Id.* at pp. 1042-1043.) On appeal, the Supreme Court considered "the propriety of *permitting* the gang expert to respond to the hypothetical questions the prosecution asked regarding whether defendants' [crime] was gang related." (*Id.* at p. 1044, italics added.) The Supreme Court found the hypothetical questions permissible. It rejected the defense argument that the hypothetical questions mirrored the facts of the case too closely: "The parties agree that the hypothetical questions of this case were based on the evidence. But the Court of Appeal found these questions were too closely based on the evidence in a manner that was only 'thinly disguised.' This conclusion transforms the *requirement* that a hypothetical question be rooted in the evidence into a *prohibition*—or at least into the confounding rule that the party posing the question must disguise from the jury the fact it is rooted in the evidence—and not 'thinly,' it appears, but thickly." (*Id.* at p. 1046.)

Contrary to defendants' interpretation, the Supreme Court did not announce a general rule that questions soliciting the opinions of a gang expert must be phrased hypothetically. The Supreme Court explicitly recognized that "in some circumstances, expert testimony regarding the specific defendants might be proper." (*Vang, supra*, 52 Cal.4th at p. 1048, fn. 4, citing *People v. Valdez* (1997) 58 Cal.App.4th 494, 507 (*Valdez*).) After *assuming* the gang expert could not properly have testified about the

29

defendants under the facts of that case (*Vang,* at p. 1048), the Supreme Court explained that the propriety of the questions should be judged against the statutory requirement that the subject matter must be sufficiently beyond common experience to assist the trier of fact. (*Id.* at p. 1048.) The Supreme Court concluded, "To the extent the expert may not express an opinion regarding the actual defendants, that is because the jury can determine what the defendants did as well as an expert, not because of a prohibition against the expert opining on the entire subject. Using hypothetical questions is just as appropriate on this point as on other matters about which an expert may testify." (*Id.* at p. 1052.)

In *Valdez*, which the Supreme Court cited in *Vang*, the Court of Appeal considered whether a gang expert's testimony, not in response to hypothetical questions, was admissible. (*Valdez, supra*, 58 Cal.App.4th at pp. 503-504.) The facts of the case involved an unusual scenario: A group of individuals from seven different gangs united together to murder a rival gang member. (*Id.* at pp. 499, 503.) As the Supreme Court later instructed, the Court of Appeal in *Valdez* assessed the expert's testimony based on whether it would assist the trier of fact under the circumstances of that case: "Under the circumstances, the questions of how such a diverse group, which, in [the gang expert's] opinion, represented seven different Norteño gangs, could have been acting for the benefit of a street gang and whether the participants were doing so presented matters far beyond the common experience of the jury and justified expert testimony. . . . Given the unique facts and [the gang expert's] expertise in evaluating the history, customs, and behavior of Hispanic gangs in general, and Norteño gangs in particular, we cannot say the trial court abused its discretion in finding that an expert opinion about whether the

30

participants acted for the benefit of each and every gang represented by the caravan would be of assistance to the jury in evaluating the evidence and determining whether the prosecution had proved the enhancement allegation." (*Id.* at pp. 508-509.)[4]

The facts here were similarly unusual. The defendants were members of two different gangs, BLP and Hickory Street Watts, and the relationships among the defendants were complex. The charged offenses took place far from BLP's gang territory, and the spree of violence unfolded without a clear motive. Given these facts, and the well-settled rule that "expert testimony regarding whether a crime was gang related is admissible" because "[s]uch matters are sufficiently beyond common experience that expert testimony would assist the jury" (*Vang, supra*, 52 Cal.4th at p. 1049, fn. 5), the trial court could reasonably believe Sarti's opinion testimony about the charged crimes would be helpful to the jury. (See *Valdez, supra*, 58 Cal.App.4th at pp. 508-509.) The court did not abuse its discretion in admitting testimony that the charged offenses were committed for the benefit of, at the direction of, or in association with a criminal street gang.

_____

[4]    Other cases have approved expert opinion testimony about a specific defendant or charged offense, rather than a hypothetical defendant or offense. (See *Lindberg, supra*, 45 Cal.4th at p. 49 [no error in admission of expert testimony that "defendant was a White supremacist"]; *People v. Carter* (1997) 55 Cal.App.4th 1376, 1377-1378 [no error in admission of expert testimony that "defendant possessed rock cocaine for purposes of sale"].) Expert testimony on such topics must be assessed in each case, based on the specific facts of the case and the expert's proposed testimony, and this assessment is committed to the trial court's sound discretion. In many, even most, cases such testimony will be unhelpful. (See, e.g., *Vang, supra*, 52 Cal.4th at pp. 1048-1049.) As we explain, however, defendants have not shown that the trial court abused its discretion in finding Sarti's testimony helpful to the jury under the facts here.

Guerrero argues the jury was just as able as Sarti to determine whether the charged offenses were committed for the benefit of, at the direction of, or in association with BLP, once Sarti had explained the concepts of gang reputation and territory. Given the unusual facts of this case, however, we cannot say Sarti's opinion on this issue was wholly unhelpful. (See *Lindberg, supra*, 45 Cal.4th at p. 45 ["In determining the admissibility of expert testimony, 'the pertinent question is whether, even if jurors have some knowledge of the subject matter, expert opinion testimony would assist the jury.' "]; see also *People v. McAlpin* (1991) 53 Cal.3d 1289, 1299-1300.) Just as in *Valdez*, the opinions of Sarti, a gang expert who had years of experience with BLP and criminal street gangs, could reasonably assist the jury in determining whether the charged crimes were committed for the benefit of, at the direction of, or in association with BLP because Sarti could bring his expertise to bear on that issue. (See *Valdez, supra*, 58 Cal.App.4th at pp. 508-509.)

Defendants have not shown the court abused its discretion in admitting Sarti's opinion testimony. Because we find no error, we need not consider defendants' contentions regarding the prejudicial effect of the claimed error.

B

Following oral argument in this appeal, the Supreme Court decided *People v. Sanchez* (2016) 63 Cal.4th 665 (*Sanchez*). *Sanchez* held, among other things, that a gang expert may not "relate as true case-specific facts asserted in hearsay statements, unless they are independently proven by competent evidence or are covered by a hearsay exception." (*Id.* at p. 686.) We requested supplemental briefing regarding *Sanchez*'s

32

potential effect on the disposition of this appeal. In their supplemental briefs, Guerrero, Dimas, and Acosta argue that the trial court erred under *Sanchez* by allowing Sarti to testify regarding certain case-specific facts derived from hearsay and to opine regarding the relationship between the charged crimes and the criminal street gang BLP based on those facts.

At trial, the prosecutor questioned Sarti regarding his background, the characteristics of criminal street gangs in general and of BLP in particular, and the specific factual bases for his opinions. As to his opinion that Acosta was an active member of BLP, Sarti testified that he relied on his personal contacts with Acosta, in which Acosta admitted he was an active member of BLP; tattoos on Acosta's body showing affiliation with BLP; and another contact with law enforcement in which Acosta hid a loaded gun under the driver's seat of his vehicle and again admitted to being an active member of BLP. As to Guerrero, Sarti testified that he relied on Guerrero's tattoos as well as field identification cards prepared by other law enforcement officers in which Guerrero admitted to being an active member of BLP. For Dimas, Sarti relied on his personal contacts with Dimas in the presence of Acosta's brother, a BLP member; Dimas's tattoo of Acosta's BLP gang moniker; and the facts of the charged crimes.

As we have discussed, Sarti testified that he was familiar with the facts of the charged crimes in response to lengthy narrative questions posted by the prosecutor. Sarti explained that his familiarity was based on reports provided by the district attorney's office and conversations with a detective in the San Bernardino County Sheriff's Department. Other than stating that the prosecutor's recitation of facts was consistent

33

with his understanding, Sarti did not relate specific aspects of the reports or his conversations with the detective.

*Sanchez* provides the framework for analyzing the admissibility of expert testimony alleged to be inadmissible hearsay. "While lay witnesses are allowed to testify only about matters within their personal knowledge (Evid. Code, § 702, subd. (a)), expert witnesses are given greater latitude." (*Sanchez, supra*, 63 Cal.4th at p. 675.) "In addition to matters within their own personal knowledge, experts may relate information acquired through their training and experience, even though that information may have been derived from conversations with others, lectures, study of learned treatises, etc." (*Ibid.*) Historically, "an expert's testimony concerning his general knowledge, even if technically hearsay, has not been subject to exclusion on hearsay grounds." (*Id.* at p. 676.) "By contrast, an expert has traditionally been precluded from relating *case-specific* facts about which the expert has no independent knowledge." (*Ibid.*)

*Sanchez* recognized the line between these two categories had become blurred. The governing statute provides that, in addition to his or her general knowledge, an expert "may state on direct examination the reasons for his opinion and the matter . . . upon which it is based, unless he is precluded by law from using such reasons or matter as a basis for his opinion." (Evid. Code, § 802.) "Accordingly, in support of his opinion, an expert is entitled to explain to the jury the 'matter' upon which he relied, even if the matter would ordinarily be inadmissible." (*Sanchez, supra*, 63 Cal.4th at p. 679.) Confronted by hearsay objections to an expert's description of the "matter" upon which his or her opinion was based, courts developed the principle that such matters were

34

offered only for the purpose of evaluating the expert's testimony—and not for their truth, thus obviating any hearsay objection—and instructed juries accordingly. (*Id.* at p. 679, citing *People v. Montiel* (1993) 5 Cal.4th 877, 919.) "Thus, under this paradigm, there was no longer a need to carefully distinguish between an expert's testimony regarding background information and case-specific facts. The inquiry instead turned on whether the jury could properly follow the court's limiting instruction in light of the nature and amount of the out-of-court statements admitted." (*Sanchez,* at p. 679.)

*Sanchez* rejected this paradigm and disagreed that an expert's testimony regarding the matters on which his or her opinion is based is not offered for its truth: "When an expert relies on hearsay to provide case-specific facts, considers the statements as true, and relates them to the jury as a reliable basis for the expert's opinion, it cannot logically be asserted that the hearsay content is not offered for its truth. In such a case, 'the validity of [the expert's] opinion ultimately turn[s] on the truth' [citation] of the hearsay statement. If the hearsay that the expert relies on and treats as true is *not* true, an important basis for the opinion is lacking." (*Sanchez, supra*, 63 Cal.4th at pp. 682-683.)

Under *Sanchez*, because the expert's testimony is offered for its truth, it may be hearsay and must be evaluated for admissibility as such. "Like any other hearsay evidence, it must be properly admitted through an applicable hearsay exception." (*Sanchez, supra*, 63 Cal.4th at p. 684.) "An expert may still *rely* on hearsay in forming an opinion, and may tell the jury *in general terms* that he did so." (*Ibid*.) "What an expert *cannot* do is relate as true case-specific facts asserted in hearsay statements, unless they are independently proven by competent evidence or are covered by a hearsay

35

exception." (*Id.* at p. 686.) And, like any hearsay, if the out-of-court statement is testimonial and offered against the defendant in a criminal prosecution, *Crawford v. Washington* (2004) 541 U.S. 36 (*Crawford*) and its progeny govern its admissibility. (*Sanchez,* at p. 686.)[5]

Acosta and Dimas argue that Sarti's responses to the prosecutor's narrative questions regarding the facts of the charged crimes were inadmissible hearsay under *Sanchez* because Sarti's understanding of those facts was derived from reports provided by the prosecution and discussions with a detective. The reports were not entered into evidence, and the detective who provided information to Sarti did not testify. We agree that Sarti's testimony effectively related the substance of the hearsay sources on which he relied and provided case-specific factual information from those sources to the jury. The prosecutor summarized, in detail, case-specific facts and asked Sarti if they were consistent with his understanding. By answering in the affirmative, Sarti informed the jury that the hearsay sources he relied upon contained the same facts.

The Attorney General points out that the prosecutor's questions were explicitly tied to the testimony at trial and Sarti did not directly summarize the contents of his hearsay sources. Sarti, however, did not base his understanding of the facts on trial testimony. His understanding came from hearsay sources. When Sarti agreed that his

---

5       *Sanchez* did not affect the longstanding rule that an expert may testify regarding general principles in his or her field even if based on hearsay: "Our decision does not call into question the propriety of an expert's testimony concerning background information regarding his knowledge and expertise and premises generally accepted in the field." (*Sanchez, supra*, 63 Cal.4th at p. 685.)

36

understanding of the facts was consistent with the prosecutor's recitation, therefore, Sarti was confirming that the contents of those hearsay sources was consistent with the trial testimony. Because the jury heard testimony regarding the contents of hearsay statements, they were inadmissible absent a showing of an exception to the hearsay rule. And, given their likely testimonial content, a showing of admissibility under *Crawford* was required as well.

Assuming no hearsay exception (or exceptions, given the likely multiple layers of hearsay in the reports and the detective's statements) applied, and the statements were testimonial, we nonetheless conclude the admission of Sarti's testimony was harmless. The erroneous admission of testimonial hearsay in a criminal prosecution requires reversal unless the error was harmless beyond a reasonable doubt. (*Sanchez, supra*, 63 Cal.4th at p. 699; *People v. Capistrano* (2014) 59 Cal.4th 830, 874 (*Capistrano*).) Here, the hearsay statements at issue merely confirmed the uncontradicted testimony at trial regarding the charged crimes. Defendants did not offer any evidence of an alternate version of the events or raise significant credibility issues with the witnesses who testified to those facts at trial. Under these circumstances, and based on our review of the record, the brief repetition of the facts surrounding the charged crimes could not reasonably have had any effect on the jury's verdict, including the gang enhancements. It was therefore harmless beyond a reasonable doubt.[6]

---

6    Under *Sanchez*, it was permissible for Sarti to rely on hearsay sources, identify those sources to the jury, and render his opinion based on them. (*Sanchez, supra*, 63 Cal.4th at p. 684.) Dimas's additional claims that Sarti impermissibly *relied* on

Guerrero and Dimas argue that Sarti impermissibly relied on their codefendants' admissions of active membership in BLP (for Guerrero, Acosta's admissions; for Dimas, Acosta and Guerrero's admissions) in testifying that the crimes were committed for the benefit of and in association with BLP.  It is well settled that the court must limit the purpose of any prior statement by a defendant who does not testify at trial for use against that defendant only (and not his or her codefendants) to safeguard the codefendant's rights under the Sixth Amendment.  (*People v. Fletcher* (1996) 13 Cal.4th 451, 463; see CALCRIM No. 305.)  Where a defendant's prior statement is facially incriminating of the codefendant, it generally may not be admitted at a joint trial, even with a limiting instruction, unless it is properly sanitized.  (*Bruton v. United States* (1968) 391 U.S. 123, 135-136; *People v. Aranda* (1965) 63 Cal.2d 518, 530; *Capistrano, supra*, 59 Cal.4th at p. 869.)  However, " ' "this narrow exception should not apply to confessions that are not incriminating on their face, but become so only when linked with other evidence introduced at trial." ' "  (*Capistrano,* at p. 869.)

Here, the defendants' admissions of active membership in BLP did not facially incriminate their codefendants.  The admissions could therefore be offered into evidence with a proper limiting instruction, which the trial court provided in this case.[7]  Although

_____

various hearsay sources for other case specific information therefore do not establish error.  The error at issue is limited to Sarti's testimony relating the contents of hearsay sources to the jury.

[7]    The trial court instructed the jury as follows:  "You have heard evidence that defendant Reginaldo Acosta made a statement out of court.  You may consider that evidence only against him, not against any other defendant.  [¶]  You have heard

Sarti relied in part on each defendant's admissions to testify that the individual defendant was an active member of BLP, and then relied on such membership to testify that the charged crimes were committed for the benefit of or in association with BLP, Guerrero and Dimas have not shown the jury's verdict necessarily relied on defendants' admissions to implicate their codefendants. The prosecution offered ample evidence of Acosta's and Guerrero's active membership in BLP in addition to their admissions, such as their tattoos. (See part V, *ante*.) In the absence of evidence to the contrary, we assume the jury followed the court's instructions and properly limited their consideration of defendants' admissions. (See *People v. Edwards* (2013) 57 Cal.4th 658, 746 [" 'We of course presume "that jurors understand and follow the court's instructions." ' "].) Guerrero and Dimas have not established an *Aranda/Bruton* claim or any other constitutional violation. *Sanchez* does not change this analysis. The limiting instruction applies to evidence of a codefendant's statement, from whatever source, lay or expert, inadmissible hearsay or not. Even if evidence of a defendant's admission should not have been admitted under *Sanchez*, it is harmless as to a codefendant in light of the court's limiting instruction.[8]

Dimas additionally contends that Sarti relied on other law enforcement officers' contacts with her, rather than his own personal contacts, as a basis for his opinion that

---

evidence that defendant Edwin Guerrero made a statement out of court. You may consider that evidence only against him, not against any other defendant."

[8] We note that Guerrero does not assert error under *Sanchez* in the admission of his own statements against him.

39

Dimas was an associate of BLP. Her contention is pure speculation. Sarti testified to his personal contacts and did not mention contacts by any other law enforcement officer.

Dimas also briefly claims that Sarti's testimony regarding the meaning of her tattoo with Acosta's gang moniker was improper. The relationship of this claim to *Sanchez*, the subject of Dimas's supplemental briefing, is unclear. And, in any event, Dimas has not shown error. Sarti could properly testify regarding his opinion of the meaning of Dimas's tattoo based on his knowledge and experience with criminal street gangs.

VIII

*Ineffective Assistance of Counsel at Sentencing*

Guerrero contends his counsel was ineffective at sentencing. He argues his counsel should have objected to his sentence on the ground that Guerrero's status as a juvenile when the offenses were committed precludes a sentence that fixes his parole eligibility for a time beyond Guerrero's natural life expectancy. " 'Under existing law, a defense attorney who fails to adequately understand the available sentencing alternatives, promote their proper application, or pursue the most advantageous disposition for his client may be found incompetent. [Citations.]' [Citation.] 'A defendant claiming ineffective assistance of counsel must satisfy *Strickland*'s [*Strickland v. Washington* (1984) 466 U.S. 668] two-part test requiring a showing of counsel's deficient performance and prejudice. [Citation.] As to deficient performance, a defendant "must show that counsel's representation fell below an objective standard of reasonableness" measured against "prevailing professional norms." [Citation.] "Judicial scrutiny of counsel's performance must be highly deferential," and a court must evaluate counsel's

40

performance "from counsel's perspective at the time" without "the distorting effects of hindsight," and "a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." ' " (*People v. Speight* (2014) 227 Cal.App.4th 1229, 1248 (*Speight*).)

Four years before Guerrero's sentencing, the United States Supreme Court decided *Graham v. Florida* (2010) 560 U.S. 48 (*Graham*). In *Graham*, the United States Supreme Court held "that for a juvenile offender who did not commit homicide the Eighth Amendment forbids the sentence of life without parole." (*Id.* at p. 74.) "A State is not required to guarantee eventual freedom to a juvenile offender convicted of a nonhomicide crime. What the State must do, however, is give defendants like Graham some meaningful opportunity to obtain release based on demonstrated maturity and rehabilitation. It is for the State, in the first instance, to explore the means and mechanisms for compliance. It bears emphasis, however, that while the Eighth Amendment prohibits a State from imposing a life without parole sentence on a juvenile nonhomicide offender, it does not require the State to release that offender during his natural life. Those who commit truly horrifying crimes as juveniles may turn out to be irredeemable, and thus deserving of incarceration for the duration of their lives. The Eighth Amendment does not foreclose the possibility that persons convicted of nonhomicide crimes committed before adulthood will remain behind bars for life. It does prohibit States from making the judgment at the outset that those offenders never will be fit to reenter society." (*Id*. at p. 75.)

Two years before Guerrero's sentencing, the California Supreme Court held that *Graham*'s prohibition extended to juvenile nonhomicide offenders sentenced to "a term of years with a parole eligibility date that falls outside the juvenile offender's natural life expectancy . . . ." (*People v. Caballero* (2012) 55 Cal.4th 262, 268 (*Caballero*).) The Supreme Court explained, "Although proper authorities may later determine that youths should remain incarcerated for their natural lives, the state may not deprive them at sentencing of a meaningful opportunity to demonstrate their rehabilitation and fitness to reenter society in the future." (*Ibid.*) "[T]he sentencing court must consider all mitigating circumstances attendant in the juvenile's crime and life, including but not limited to his or her chronological age at the time of the crime, whether the juvenile offender was a direct perpetrator or an aider and abettor, and his or her physical and mental development, so that it can impose a time when the juvenile offender will be able to seek parole from the parole board." (*Id.* at pp. 268-269.) If Guerrero were not eligible for parole until after his natural life expectancy, his sentence would be unconstitutional under *Caballero*.[9] Under those circumstances, Guerrero's counsel would have been deficient in failing to object to Guerrero's sentence based on *Caballero*. (See *Speight,*

---

9    Guerrero was 19 years old at the time of his sentencing. We grant Guerrero's unopposed motion for judicial notice of the United States Life Tables, published in the Centers for Disease Control and Prevention's National Vital Statistics Reports. (See Evid. Code, § 452, subd. (h).) According to the Life Tables, the natural life expectancy of a male between the ages of 19 and 20 is 77 years. (The life expectancy for a Hispanic male of the same age is 79.5 years.) Because Guerrero would not be eligible for parole under his sentence until he was 81 years old (after considering presentence custody credits), this eligibility date falls outside his natural life expectancy regardless whether Guerrero's ethnicity is considered.

42

*supra*, 227 Cal.App.4th at p. 1249 [counsel rendered ineffective assistance by failing to object based on *Caballero*].)

The Attorney General argues that subsequent legislative developments render Guerrero's argument under *Caballero* moot. In response to *Graham* and *Caballero*, the Legislature enacted Senate Bill No. 260, which added section 3051 to the Penal Code. That statute establishes a mechanism for certain juvenile offenders to obtain a "youth offender parole hearing" before the offender would otherwise be eligible for parole.[10] The time for such a hearing is based on the "controlling offense" for which the juvenile offender was convicted, which the statute defines as "the offense or enhancement for which any sentencing court imposed the longest term of imprisonment." (§ 3051, subd. (a)(2)(B).) For example, "A person who was convicted of a controlling offense that was committed before the person had attained 23 years of age and for which the sentence is a life term of 25 years to life shall be eligible for release on parole by the board during his or her 25th year of incarceration at a youth offender parole hearing, unless previously released or entitled to an earlier parole consideration hearing pursuant to other statutory provisions." (§ 3051, subd. (b)(3).) Although Guerrero's sentence appears invalid under prior law, the Attorney General argues that section 3051 resolves any constitutional infirmity by providing a mechanism for release within Guerrero's natural life expectancy.

---

10      The statute excludes juvenile offenders sentenced under the Three Strikes law (§§ 667, subds. (b)-(i), 1170.12) or pursuant to enhanced penalties for certain felony sex offenses (§ 667.61), among other circumstances. (§ 3051, subd. (h).) These circumstances are inapplicable here.

While this appeal was pending, the California Supreme Court decided section 3051 moots an analogous constitutional claim under *Miller v. Alabama* (June 25, 2012, Nos. 10-9646 and 10-9647) 567 U.S. ___ [132 S.Ct. 2455, 2460] (*Miller*), which held that the Eighth Amendment prohibited mandatory sentences of life imprisonment without parole for juvenile homicide offenders. (*People v. Franklin* (2016) 63 Cal.4th 261, 279-280 (*Franklin*).) In *Franklin*, the Supreme Court considered whether a mandatory sentence of 50 years to life imprisonment for a juvenile homicide offender was constitutionally permissible in light of section 3051. (*Id.* at p. 268.) *Franklin* recognized that, under prior law, the defendant would not be eligible for parole until he had served 50 years of his sentence. (*Id.* at p. 273, citing § 3046, subd. (b).) The defendant contended this sentence would the functional equivalent of life imprisonment without parole and impermissible under *Miller*. (*Franklin,* at p. 276.) Building on *Caballero*, *Franklin* agreed that *Miller* applied not only to mandatory sentences of life imprisonment without parole but also to functionally equivalent sentences. (*Franklin,* at p. 276.) But *Franklin* determined that the defendant's parole eligibility had changed after the enactment of section 3051: He would be eligible for parole after serving 25 years. (*Id.* at p. 278.) *Franklin* concluded that the defendant's constitutional claim was moot under these circumstances: "In sum, the combined operation of section 3051, section 3046, subdivision (c), and section 4801 means that [the defendant] is now serving a life sentence that includes a meaningful opportunity for release during his 25th year of incarceration. Such a sentence is neither [life imprisonment without parole] nor its functional equivalent. Because [the defendant] is not serving [a sentence of life

imprisonment without parole] or its functional equivalent, no *Miller* claim arises here. The Legislature's enactment of Senate Bill No. 260 has rendered moot [the defendant's] challenge to his original sentence under *Miller*." (*Id.* at pp. 279-280.) The Supreme Court remanded the matter, however, for "a determination of whether [the defendant] was afforded sufficient opportunity to make a record of information relevant to his eventual youth offender parole hearing." (*Id.* at p. 284.) If the trial court determined that the defendant was not afforded a sufficient opportunity, it was directed to receive submissions and evidence relevant to that issue. (*Ibid.*)

As Guerrero concedes in supplemental briefing, the reasoning in *Franklin* applies equally to his sentence. Under section 3051, Guerrero will be eligible for parole after 25 years of imprisonment. Guerrero therefore does not attempt to show his trial counsel was ineffective at sentencing with respect to the term itself. Guerrero argues, however, that his counsel's failure to object deprived Guerrero of the opportunity to present mitigating information regarding youth-related factors that would be relevant at his eventual youth offender parole hearing under section 3051. Based on our review of the record, we agree. We will therefore remand the matter to the trial court to provide the parties with the opportunity to make an accurate record of Guerrero's youth-related characteristics and circumstances at the time of the offense so that an adequate record exists when Guerrero's youth offender parole hearing occurs. (*Franklin, supra*, 63 Cal.4th at p. 284.)

45

IX

*Prior Juvenile Adjudication as a Basis for Enhanced Sentencing*

Acosta contends the court erred in two respects by using his prior juvenile adjudication for robbery (§ 211) to enhance his sentence. We consider each contention in turn.

Acosta first argues the court erred by using this adjudication as a prior strike conviction under the Three Strikes law. As Acosta acknowledges, our Supreme Court rejected this argument in *People v. Nguyen* (2009) 46 Cal.4th 1007, 1028. We are bound to adhere to this authority (*Auto Equity Sales, Inc. v. Superior Court* (1962) 57 Cal.2d 450, 455), and we reject his argument on that basis.

Acosta next argues the court erred by using this adjudication to add a five-year sentencing enhancement under section 667, subdivision (a). That statute provides, in relevant part, as follows: "[A]ny person convicted of a serious felony who previously has been convicted of a serious felony in this state . . . , shall receive, in addition to the sentence imposed by the court for the present offense, a five-year enhancement for each such prior conviction on charges brought and tried separately." (§ 667, subd. (a)(1).)

"Section 667[, subdivision] (a) was added to the Penal Code in 1982 by the passage of the voter initiative Proposition 8, commonly known as The Victims' Bill of Rights, that made sweeping changes to California's criminal laws. [Citations.] The substance of the statute has changed little since its original enactment . . . ." (*People v. Park* (2013) 56 Cal.4th 782, 795.) Soon after its enactment, the Court of Appeal in *People v. West* (1984) 154 Cal.App.3d 100 (*West*) considered whether the statute applied

46

to juvenile adjudications. After reviewing prior authority, the text of the statute and related constitutional provisions, and ballot materials, the court determined that use of the term "conviction" in the statute excluded juvenile adjudications. (*West, supra*, 154 Cal.App.3d at pp. 108-110.) Following *West*, courts have recognized that "juvenile adjudications cannot be considered . . . a prior serious felony conviction for purposes of the mandatory five-year enhancement in section 667, subdivision (a)." (*People v. Smith* (2003) 110 Cal.App.4th 1072, 1080, fn. 10; see *People v. Garcia* (1999) 21 Cal.4th 1, 24 (conc. & dis. opn. of Brown, J.) [citing *West* on this issue with approval]; *People v. O'Neal* (2000) 78 Cal.App.4th 1065, 1068 [concession of error under *West* by the Attorney General].)

The Attorney General argues that the reasoning of *West* was undermined by a 1994 amendment to the statute, which added (among other provisions) section 667, subdivision (d)(3). (Stats. 1994, ch. 12, § 1.) That subdivision provides that "[a] prior juvenile adjudication shall constitute a prior serious and/or violent felony for purposes of sentence enhancement" under certain conditions. (§ 667, subd. (d)(3).) But the Attorney General ignores the express language of the statute, which limits the application of that subdivision as follows: "Notwithstanding any other law and *for purposes of subdivisions* (*b*) *to* (*i*)*, inclusive*, a prior conviction of a serious and/or violent felony shall be defined as . . . ." (§ 667, subd. (d), italics added.) Section 667, subdivision (a), is expressly excluded. The 1994 amendment does not affect the enhancement at issue here. We therefore join the courts following *West* and conclude the trial court erred by using Acosta's juvenile adjudication for robbery as a basis for enhancement under section 667,

47

subdivision (a). On remand, the trial court should not apply this enhancement based on Acosta's juvenile adjudication for robbery.

X

*Prior Conviction for Carrying a Concealed Firearm*

Acosta contends the evidence does not support the court's finding that his prior conviction for carrying a concealed firearm in a vehicle (former § 12025, subd. (a)(1)) was a prior serious felony conviction under section 667, subdivision (a), and a prior serious or violent felony conviction under section 667, subdivision (d). After briefing in this appeal was complete, Acosta filed a petition for writ of habeas corpus alleging that this prior conviction was dismissed by the superior court and could therefore no longer provide a basis for the court's finding. (*In re Acosta* (order to show cause issued Jan. 6, 2016, D069375).) In a separate opinion filed on this date, we grant relief and vacate the court's finding.

Acosta's contention in this appeal is now moot in light of our order granting relief in connection with Acosta's habeas petition. A reversal for insufficiency of the evidence in this appeal would not bar retrial of the prior conviction allegation. (*People v. Barragan* (2004) 32 Cal.4th 236, 259; *People v. Marin* (2015) 240 Cal.App.4th 1344, 1366.) Acosta can therefore gain no additional benefit in this appeal beyond what he has already obtained. Because Acosta's contention is moot, we decline to consider its merits. We also deny Acosta's motion to consolidate this appeal with the proceedings on his habeas petition.

## XI

### *Prior Prison Term Enhancement*

Acosta contends the trial court erred by adding an additional one-year sentencing enhancement under section 667.5, subdivision (b), to his aggregate sentence after adding one-year sentencing enhancements to each count of conviction under the same section. (See *People v. Williams* (2004) 34 Cal.4th 397, 404-405 [considering analogous enhancements under section 667, subdivision (a)(1), and concluding that they should be added to each individual count, not the aggregate sentence].)  The Attorney General agrees the court erred.  On remand, the court should not add this additional one-year sentencing enhancement.

## XII

### *Presentence Custody Credits*

Acosta further contends the court erred in calculating his presentence custody credits.  Acosta was incarcerated from the date of his arrest (October 30, 2012) through and including the date of sentencing (August 15, 2014).  The trial court awarded 654 days actual credit and 98 days conduct credit.  Acosta argues the period of incarceration was 655 actual days.  The Attorney General agrees.  On remand, the court should award Acosta 655 days actual credit and 98 days conduct credit, for a total of 753 days presentence custody credits.

## DISPOSITION

Guerrero's conviction for carjacking under Penal Code section 215 is reversed with directions to dismiss that charge, and his stayed sentence for that offense is vacated.

49

The matter is remanded to allow Guerrero an adequate opportunity to make a record of information relevant to his eventual youth offender parole hearing. The superior court is directed to prepare an amended abstract of judgment and deliver it to the Department of Corrections and Rehabilitation. In all other respects, the judgment against Guerrero is affirmed.

Dimas's conviction for carjacking under Penal Code section 215 is reversed with directions to dismiss that charge, and her stayed sentence for that offense is vacated. The superior court is directed to prepare an amended abstract of judgment and deliver it to the Department of Corrections and Rehabilitation. In all other respects, the judgment against Dimas is affirmed.

Acosta's motion to consolidate is denied.  Acosta's conviction for carjacking under Penal Code section 215 is reversed with directions to dismiss that charge.  Acosta's sentence is vacated, and the matter is remanded to the trial court for resentencing consistent with this opinion.  Following resentencing, the superior court is directed to prepare an amended abstract of judgment and deliver it to the Department of Corrections and Rehabilitation.  In all other respects, the judgment against Acosta is affirmed.

McDONALD, J.

WE CONCUR:

HALLER, Acting P. J.

PRAGER, J.[*]

---

[*] Judge of the San Diego Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.